OPINION OF THE COURT
Shirley Werner Kornreich, J.
Motion sequences 012 and 013 are consolidated for disposition.
Motions before the Court
These motions are based upon a written asset sale agreement, dated as of September 12, 2007 (ASA),[1] between defendants,[2] as sellers, and plaintiffs,[3] as purchasers. The ASA was an agreement by PPG and its affiliates to sell its automotive glass and services business (AG&S) to plaintiffs for $500,000,000. Plaintiffs’ motion seeks partial summary judgment on liability on their claim that defendants breached section 2.20 (a) of the ASA. Defendants move for partial summary judgment on the grounds that plaintiffs cannot establish: (1) a material adverse event as defined in the ASA; and (2) that defendants would not have been able to obtain certain governmental and third-party consents, which were among the conditions precedent to plaintiffs’ obligation to close, if plaintiffs had not terminated the ASA on January 10, 2008.
Background
The sellers “Business” is a defined term in the ASA:
“The Sellers are in the business of manufacturing, *773 distributing, selling, marketing, designing and developing automotive glass products and related products to the original equipment manufacturer (‘OEM’) market and aftermarket, and of providing related products and services to insurers and aftermarket customers, in North America and Europe (collectively, the ‘Business’) through unincorporated divisions and certain subsidiaries and joint ventures of the Sellers.” (ASA at 1.)
In 2007, approximately half of PPG’s business was original equipment manufacturing, which the parties refer to as “OEM,” and the other half was aftermarket glass, which is referred to by the parties as “ARG,” insurance and services. (Affirmation of Peter Villar in support of plaintiffs’ motion [Villar affirmation], exhibit B at 18.)
The fifth cause of action in plaintiffs’ first amended complaint (AC)[4] alleges that defendants breached representations and warranties in the ASA, including inter alia, the representation contained in section 2.20 (a) (sales warranty), which provides that
“(a) Schedule 2.20 (a) sets forth a complete and accurate list of the 20 largest third party customers of the Business (measured by aggregate billings) during the fiscal year ended on the Balance Sheet Date. Except as set forth on Schedule 2.20 (a), since the Balance Sheet Date, none of such customers has canceled, terminated or otherwise materially altered its relationship with the Controlled Business Entities (including any material reduction in the rate or amount of purchases or in the prices paid) or notified any Controlled Business Entity of any intention, or otherwise threatened in writing, to do any of the foregoing.” (Emphasis supplied.)
The balance sheet date is defined in the ASA as June 30, 2007. (ASA § 2.7.)[5]
Schedule 2.20 (a) is entitled “Twenty Largest Customers.” (Villar affirmation, exhibit C, document 137-3.) The fourth entry on schedule 2.20 (a) shows that Belron, which had acquired *774 Safelite, had sales of $58.5 million in the AEG segment of the business. It reads, in pertinent part, as follows:
[[Image here]]

(Id.)

Section 6 of the ASA is entitled “Conditions Precedent.” Section 6.1 provided that the plaintiffs’ obligations to close were subject to the fulfillment of, inter alia, section 6.4 on or before the closing date:
“6.1 General. The respective obligations set forth herein of the Sellers and the Purchasers to consummate the sale and purchase of the Acquired Assets at the Closing shall be subject to the fulfillment, on or before the Closing Date, in the case of the Sellers, of the conditions set forth in Sections 6.2 and 6.3, and in the case of the Purchasers, of the conditions set forth in Sections 6.2 and 6.4.” (ASA § 6.1.)
The “Closing Date” is defined in the ASA as “November 15, 2007 or such later date and time as the parties shall have agreed in writing.” (ASA § 1.5.) The ASA states that the “Closing,” a defined term, will take place: “on November 15, 2007 if all conditions set forth in Sections 6.2.1 and 6.2.2 (other than those that by their nature can only be satisfied at the Closing) have been satisfied as of such time, or such later date and time as the parties shall have agreed in writing.” (Id.)
Section 6.4 conditioned plaintiffs’ obligation to close on, inter alia, the sales warranty being true and correct in all material respects as of the closing. It provided as follows:
“Representations and Warranties of the Sellers. The representations and warranties in Section 2 shall be true and correct in all material respects (other than representations and warranties qualified by materiality, which shall be true and correct in all respects) when made and at and as of the Closing with the same effect as though made at and as of such time. The Sellers shall have duly performed and complied in all material respects with all agreements contained herein required to be performed or complied with by them at or before the Closing.” (ASA § 6.4.1 [emphasis supplied].)
The ASA provided that plaintiffs could terminate it: “if the Closing shall not have taken place on or before December 31, *775 2007 or such later date as the parties may have agreed to in writing, provided that the nonocurrence of the Closing is not attributable to a breach of the terms hereof by the party seeking termination.” (ASA § 8.4 [a] [ii].) Section 8.4 also provided for plaintiffs to pay defendants $25,000,000, referred to by the parties as a “Break-Up Fee,” if on the termination date the conditions contained in sections 6.2, 6.4.1 and 6.4.4 would have been true and accurate in all material respects:
“If this Agreement is terminated pursuant to clause (ii) of Section 8.4 (a),
and as of the date of such termination the conditions set forth in Sections 6.2, 6.4.1 and 6.4.4 would have been satisfied if the Closing had occurred on such date, then the Purchaser shall be obligated to pay to the Sellers an amount equal to $25 million.”
As previously noted, section 6.4.1 required the sales warranty to be true and correct in all material respects.
Gary Eilers was the PPG executive who was the main contact with Belron. (Villar affirmation, exhibit F, examination before trial [EBT] Kevin Romito at 136-137; Villar affirmation, exhibit U, EBT Gary Eilers at 112.) On November 2, 2007, Dino Lanno of Safelite wrote an e-mail to Gary Eilers of PPG. (Supp Villar affirmation, exhibit AA, document 137-27.) It stated:
“We have completed our evaluation of your offer to Belron, and we have concluded the following:
“We can commit to you the following volumes:
“Belron us truckload
“80,000 windshields
“140,000 tempered
“Belron us wholesale
“150,000 units through the branch
“Belron Canada at truckload
“50,000 windshields
“50,000 tempered
“Belron Canada wholesale
“0 units
“Total sales units are 470,000 from the America’s. In addition, Europe will not commit to purchasing any product for three key reasons, a 30% price differential, Chinese glass is not accepatable, and we do not want to purchase PPG glass through your distributor, ABC.
*776 “Gary, I know that the volumes are below your expectations, but if you cannot offer the prices at the volumes above, then you must prepare yourself for a significant loss in volume.” (Id.)
Jeff Davies, a PPG management executive, identified the notes of November 8, 2007 and a follow-up call the next day as “notes about a call with Platinum and management concerning Belron.” (Villar affirmation, exhibit B at 301-302, exhibit CC.) The notes reflect that PPG management communicated to Platinum that the estimate for Belron 2007 sales was $49.7 million, as opposed to the $58.5 million warranted in the ASA, and that based upon the November 2 e-mail, 2008 sales to Belron would be $31.1 million.
On November 26, 2007, Kevin Romito, AG&S vice-president of finance, sent to Jim Latch, its president, an excel spreadsheet indicating that Belron sales for 2008 would be $20,000,000 less than had been estimated in 2007. (Villar affirmation, exhibit DD, document 137-30.) Later the same day, John Costantino, the chief financial officer of AG&S, wrote an e-mail to Mr. Romito, stating, “I also thought that from the ‘08 number for Belron we were off $25MM in sales rather than $20MM.” (Villar affirmation, exhibits L at 295, FF, documents 137-12, 137-32.) Also on the same day, Mr. Costantino e-mailed Platinum[6] a spreadsheet. The subject line of the spreadsheet was “AGS Brindge ll-25-07.xls.” The attached spreadsheet indicated a $25,200,000 loss for “ARG Belron Reduction in Volume.” (Villar affirmation, exhibits GG, L at 295, documents 137-33, 137-12.)
On December 26, 2007, plaintiffs notified defendants in writing that they intended to terminate the ASA, pursuant to section 8.4, after December 31, 2007. On January 10, 2008, plaintiffs terminated the ASA.
The fifth cause of action seeks damages for defendants’ alleged breach of, inter alia, the sales warranty. The seventh cause of action seeks a declaratory judgment declaring, inter alia, that the sales warranty was breached by defendants. (AC U1I 87, 106, and prayer for relief 4.)
Discussion
I. Plaintiffs’ Motion for Partial Summary Judgment
Defendants argue that plaintiffs are not entitled to partial summary judgment on their claim that the sales warranty was *777 breached because: (1) the reduced sales by PPG to Belron “flowed from” the Belron/Safelite merger, which predated the balance sheet date, i.e., June 30, 2007; (2) plaintiffs assumed the risk of the reduced sales flowing from the merger because it was disclosed; (3) Belron manifested no intention or threat to reduce purchases because there were ongoing negotiations and proposals with Belron; (4) in 2007, it was not a known fact that PPG would have less sales to Belron; (5) internal PPG documents must be construed in favor of PPG; (6) there is no mention of events between Belron and controlled entities or subsidiaries; and (7) there are no damages beyond the $25 million dollar break-up fee. Notably, defendants do not argue that the purchases Belron agreed to in the November 2, 2007 e-mail reflected a “material reduction in the rate or amount of purchases or in the prices paid.”
A. Flow from the Merger and Assumption of Risk
By its plain language, the warranty was that as of the June 30; 2007 and as of the closing, which could not be later than December 31, 2007 absent written agreement, defendants would not have received a writing by Belron expressing a threat or intention to reduce materially the rate or amount of purchases below $58.5 million or to lower the prices it would pay, (i.e., “any material reduction in the rate or amount of purchases or in the prices paid”). In fact, on November 2, 2007, Gary Filers of PPG received a written threat or intention from Belron to materially reduce purchases and prices. There is no evidence presented by defendants that Belron rescinded its threat as of December 31, 2007, the outside closing date. Nor is it relevant whether the reduced sales to Belron flowed from a prior event. All that matters is whether the warranted facts would be true as of the closing.
The theory that plaintiffs assumed the risk of warranted facts confounds the theories of fraud and breach of warranty. The law with regard to justifiable reliance for purposes of fraud is that where a party
“has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be *778 heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.” (Rodas v Manitaras, 159 AD2d 341, 343 [1st Dept 1990] [emphasis supplied]; see also UST Private Equity Invs. Fund v Salomon Smith Barney, 288 AD2d 87, 88 [1st Dept 2001].)
However, as the New York Court of Appeals explained in CBS Inc. v Ziff-Davis Publ. Co. (75 NY2d 496, 502-506 [1990]), the analysis of reliance in a tort action based on fraud or misrepresentation (tort reliance) differs from the analysis of reliance in actions for breach of express contractual warranties (warranty reliance). The Court of Appeals in Ziff-Davis adopted the reasoning of the Southern District of New York in Ainger v Michigan Gen. Corp. (476 F Supp 1209, 1224 [1979], citing W. Prosser, Handbook on the Law of Torts, § 108, at 714-715 [4th ed 1971]). (CBS Inc. v Ziff-Davis Publ. Co., 75 NY2d at 503 [“We believe that the' analysis of the reliance requirement in actions for breach of express warranties adopted in Ainger v Michigan Gen. Corp. (supra) and urged by CBS here is correct”].) Ainger clarifies that for the purposes of tort reliance the plaintiff must have
“believed [the representation] to be true. If it appears that he knew the facts, or believed the statement to be false, or that he was in fact so skeptical as to its truth that he reposed no confidence in it, it cannot be regarded as a substantial cause of his conduct. (Ainger at 1224 [emphasis supplied].)
By contrast, in warranty reliance, “the critical question is not whether the [plaintiff] believed in the truth of the warranted information . . . but whether [it] believed [it] was purchasing the [defendant’s]promise [as to its truth].” (Ziff-Davis Publ. Co., 75 NY2d at 503 [emphasis supplied; internal quotation marks and citations omitted]; see also Merrill Lynch & Co. Inc. v Allegheny Energy, Inc., 500 F3d 171, 186 [2d Cir 2007] [applying New York law] [“In contrast to the reliance required to make out a claim for fraud, the general rule is that a buyer may enforce an express warranty even if it had reason to know that the warranted facts were untrue. ... (as long as) it believed that it was purchasing seller’s promise regarding the truth of the warranted facts”].) The distinction between tort and warranty reliance is grounded on the definition of a warranty, which is “a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.” (Metropolitan Coal Co. v Howard, 155 F2d 780, 784 [2d Cir 1946, Hand, J.].)
*779 Thus, even if plaintiffs knew that lower Belron sales or prices would flow from the merger, they did not assume that risk. Instead, they purchased an enforceable contractual warranty that protected them against the risk of Belron expressing an intention or threat in writing to lower materially its purchases below $58.5 million or the prices that it would pay.
B. Not a Known Fact in 2007, Inferences in Favor of PPG and Controlled Entity
The plain language of the ASA does not require that the reduced sales be a known fact. All that is required is a writing expressing a threat or intention to materially reduce sales below the amount listed on schedule 2.20 (a). The evidence is sufficient to establish the breach of warranty. Viewing PPG’s documents and the record as a whole in the light most advantageous to it, it was well aware that Belron had expressed an intention or threat in writing on November 2, 2007 to reduce purchases. PPG communicated this fact to Platinum and PPG executives discussed it among themselves. The November 2 e-mail was sent to a controlled entity, i.e., PPG. Plaintiffs have presented evidence that Belron threatened in writing to reduce its rate of purchases, and defendants have not adduced any evidence that Belron agreed to keep its sales at the level of the sales warranty. Nor do defendants dispute that the amount of the reduction was material.
Thus, plaintiffs are entitled to partial summary judgment on liability on their claim that defendants breached the warranty contained in section 2.20 (a) of the ASA and their claim for declaratory relief declaring that breach. Defendants’ argument that plaintiffs have not established their damages for the breach is unavailing, as plaintiffs’ motion seeks summary judgment on liability only.
II. Defendants’ Motion for Partial Summary Judgment
Defendants’ motion for partial summary judgment is moot in light of the court’s decision on plaintiffs’ motion. Section 6.1 of the contract provides that plaintiffs’ obligation to close was subject to the conditions precedent contained in sections 6.2 and 6.4. Plaintiffs have demonstrated that defendants breached the warranty contained in section 6.4.1, which provided that the warranties contained in section 2, including the sales warranty, had to be true and correct when made “and at and as of the Closing.” As plaintiffs proved that defendants could not satisfy section 6.4 as of the closing, plaintiffs were not obligated to *780 close. Whether plaintiffs can prove defendants’ failure to meet other conditions triggering plaintiffs’ obligation to close is of no moment. Defendants had to meet all of the conditions precedent to trigger plaintiffs’ obligation. Plaintiffs’ proof of failure to meet one condition is sufficient to establish defendants’ breach.
Accordingly, it is ordered that the motion by plaintiffs Project Gamma Acquisition Corporation and 3217926 Nova Scotia Company for partial summary judgment on liability on the fifth and seventh causes of action in the first amended complaint for breach of contract and declaratory judgment, insofar as said claims are based upon breach of the warranty contained in section 2.20 (a) of the asset sale agreement dated as of September 12, 2007, is granted; and it is further ordered that the motion by defendants PPG Industries, Inc., PPG Industries Securities, Inc., PPG Canada, Inc., PPG Industries Ohio, Inc., and PPG Industries de Mexico, S.A. de C.V, for partial summary judgment is denied as moot.

. Supplemental affirmation of Peter Villar in support of plaintiffs’ motion (supp Villar affirmation), exhibit N, document 137-14.

. PPG Industries, Inc., a Pennsylvania corporation (PPG), PPG Industries Securities, Inc., a Delaware corporation, PPG Canada Inc., a Canadian corporation, PPG Industries Ohio, Inc., a Delaware corporation, PPG Industries de Mexico, S.A. de C.V, a Mexican corporation.

. Project Gamma Acquisition Corporation, a Delaware corporation, and 3217926 Nova Scotia Company, a Nova Scotia unlimited liability company.

. Supp Villar affirmation, exhibit JJ, document 137-36.

. “Controlled Business Entities” is defined in the ASA as the sellers (i.e., defendants), PPG Auto Glass, LLC, a Delaware limited liability company, and the business subsidiaries. (ASA §§ 2.4, 1.1 [d].) Business subsidiaries is defined as LYNX Services, LLC and GTS Services, LLC. (ASA § 1.1 [c].)

. Platinum is the company that formed plaintiffs for the purpose of acquiring AG&S.