OPINION OF THE COURT
Shirley Werner Kornreich, J.
Motion sequence Nos. 002 and 003 are consolidated for disposition.
Defendants UBS Limited, UBS Securities LLC, and UBS AG (collectively, UBS) (sequence No. 002) and Declaration Management & Research LLC (Declaration) (sequence No. 003) move to dismiss the complaint pursuant to CPLR 3211. Defendants’ motions are granted for the reasons that follow.
This case involves allegations of fraud relating to the issuance of approximately $331 million of collateralized debt obligations (CDOs) comprised of residential mortgage backed securities (RMBS) and credit default swaps (CDSs).
A CDO is a security collateralized by a variety of debt obligations. RMBS are securities which pool residential mortgages and use the monthly interest and principal payments to pay the security holders. The mortgage pools are divided into tranches, with the senior tranches carrying the least risk, having the highest rating and earning the lowest returns. A CDS is an agreement in which the “protection buyer” pays the “protection seller” a premium to insure a “credit event,” such as a default. If a credit event occurs, the protection seller must pay the protection buyer a specified sum of money. CDS contracts are similar to insurance contracts because they are a vehicle to hedge or insure a potential loss, where the protection seller takes the long position and the protection buyer takes the short position on the collateral whose default is being insured.
In the case of a CDO based on RMBS, the CDO investor is betting that the RMBS will generate revenue, which occurs when homeowners make payments on the underlying mortgages. As with RMBS, a CDO does not always distribute revenue to its investors equally because the investors often purchase different tranches of the CDO which determine the priority of payment. The highest tranches are paid first, but have a lower rate of return. Revenue is only distributed to investors in the lower tranches if and when investors in the higher tranches have been paid, but the lower tranches offer a higher rate of return due to this risk. The lowest tranche of a CDO is known as the equity, and due to its high level of risk (which typically is *326 not assigned a credit rating), is the most difficult to sell. The bank that issues a CDO will commonly serve as the initial purchaser of a CDO’s assets, including the equity, until the bank can sell them to investors. There also are more complex CDOs known as CDOs-squared, whose investments are comprised of tranches of other CDOs.
Since, as explained above, CDSs are vehicles that allow investors to either bet long or short on a security or debt instrument, a CDS cannot exist without both a long investor and a counter-party that takes the short position. That counterparty can be the bank that sells you the CDS (such as UBS here) or another third party who the bank has solicited to take the short position (such as Magnetar, discussed infra).
I. Factual Background and Procedural History
As this decision involves a motion to dismiss, the facts recited are taken from the complaint.
A. The Parties
Plaintiffs Loreley Financing (Jersey) No. 4 Limited (L4), Loreley Financing (Jersey) No. 6 Limited (L6), Loreley Financing (Jersey) No. 28 Limited (L28), Loreley Financing (Jersey) No. 29 Limited (L29), Loreley Financing (Jersey) No. 30 Limited (L30), and Loreley Financing (Jersey) No. 32 Limited (L32) (collectively, Loreley) are companies organized under the laws of Jersey, Channel Islands. (Complaint HH 25-30.) Loreley are special purpose entities formed to invest in CDOs on a long-term, buy-and-hold basis. (1i 47.) Defendants Draco 2007-1, Ltd. (Draco Ltd), TABS 2007-7, Ltd. (TABS Ltd), AMP CDO 2007-2 (AMP Ltd), and Cairn Mezz ABS CDO iy Ltd. (Cairn Ltd) are Cayman Islands limited liability companies. (1ÍH 31, 33, 35-36.) Defendants Draco 2007-1 LLC (Draco LLC), TABS 2007-7 LLC (TABS LLC), Cairn Mezz ABS CDO IV LLC (Cairn LLC), UBS Securities LLC, and Declaration are Delaware companies. (1Í1Í 32, 34, 37, 40, 42.) UBS Limited is a limited liability company incorporated under the laws of England and Wales. (1i 39.) UBS AG is a Swiss corporation. (If 41.)
B. The CDOs
Loreley relied upon sophisticated investment advisors, non-parties IKB Deutsche Industriebank AG and IKB Credit Asset Management GmbH (collectively, IKB), and through these sophisticated advisors, purchased four CDOs from defendants that were arranged by UBS: (1) Draco 2007-1 (Draco); (2) TABS 2007-7 (TABS); (3) AMP CDO 2007-2 (AMP); and (4) Cairn Mezz ABS CDO IV (Cairn). (U 1.)
*327 1. Draco
Draco was a CDO which contained both RMBS and CDSs that was co-issued by Draco Ltd and Draco LLC. (1111 31-32.) Loreley allege that Draco was part of a series of at least 27 CDOs (the Constellation CDOs) that nonparty Magnetar Capital LLC (Magnetar)[1] used to collude with numerous financial institutions to carry out an alleged “undisclosed short-trading strategy.” (If 86.) Purportedly, Magnetar agreed to buy the notoriously difficult-to-sell equity of the Constellation CDOs from the issuing banks in exchange for the ability to select the CDOs’ assets, thus putting Magnetar in position to short those assets. (If 87.) Through a series of CDS contracts (to which the Constellation CDOs were occasionally the counterparty), Magnetar took a short position on the Constellation CDOs’ assets that was significantly in excess of its long position (that it had by virtue of being the equity holder), making Magnetar net-short on the Constellation CDOs. (If 88.) In the case of Draco, Magnetar’s short position was three times larger than its long position. (If 89.)
In December 2006, UBS and Declaration solicited IKB, seeking Loreley’s investment in Draco. (IT 94.) In January 2007, UBS provided IKB with a term sheet and marketing book (the Draco offering materials) that represented that Declaration would serve as Draco’s independent collateral manager. (U 96.) The Draco offering materials provided, inter alia, that (1) Declaration would select and manage Draco’s portfolio of assets for the benefit of Draco’s investors; (2) Draco would not enter into CDS contracts that referenced the ABS Home Equity Index (the ABX); and (3) all CDS collateral would be acquired on an arm’s length basis for fair market value. (IfIf 99, 104, 106.) Draco and Declaration were also parties to a collateral management agreement that provided that all proposals to enter into or terminate CDS transactions must only be initiated by Declaration and that CDS transactions cannot be entered into upon the recommendation, request, or solicitation of a counterparty to such transaction. (If 103.)
On February 22, 2007, L6 and L28 made a $60 million investment in Draco. (If 157.) By February 2008, L6’s and L28’s investment in Draco became virtually worthless due to events of default and downgrades by the ratings agencies. (IfIf 160-162.) *328 Loreley allege that their losses were caused by Declaration’s failure to abide by the terms of the Draco offering materials and that Declaration did so (and intended to do so when it originally solicited Loreley) to aid in the Constellation CDO scheme with UBS and Magnetar. (1T1T 3-6.)
2. TABS
TABS was a CDO which contained both RMBS and CDSs that was co-issued by TABS Ltd and TABS LLC. (1111 33-34.) UBS served as the initial protection buyer on CDSs issued by TABS. (If 166.) On January 12, 2007, UBS solicited IKB to advise Loreley to invest in TABS. (Id.) UBS provided IKB with a marketing book and offering circular (the TABS offering materials) which represented that nonparty Tricadla CDO Management, LLC (Tricadla) would serve as the independent collateral manager for TABS. (11167.) The TABS offering materials represented that TABS’s investments could “withstand extreme conditions and adhere to a zero principal-loss standard” and would be purchased on an arm’s length basis for fair market value. (1f1f 168-170.)
On March 20, 2007, L4 made a $100 million investment in TABS. (1Í 204.) On November 9, 2007, TABS experienced an event of default allegedly caused by a change in the methodology Moody’s used to rate TABS’s assets. (If 209.) On January 10, 2008, TABS’s $2.25 billion portfolio was liquidated for $65 million, which was only sufficient to pay TABS’s senior obligations (some of which were allegedly held by UBS). (If 215.) As a result, L4’s entire investment in TABS was rendered worthless. (If 216.)
Loreley allege that Tricadla did not act as an independent collateral manager for TABS and that, in fact, TABS was used as a dumping ground for UBS to unload its long position in RMBS due to its “peculiar knowledge” about the deterioration of the RMBS market. (1Í1Í172-174.) Moreover, UBS allegedly profited from TABS by taking short positions on such securities by purchasing protection on TABS’s CDS contracts. (If 178.) Additionally, Loreley claim UBS caused TABS to heavily invest in the Constellation CDOs as part of UBS’s purported scheme with Magnetar discussed supra, part I.B.l. (If 191.)
3. AMP
AMP was a CDO-squared that was issued by AMP Ltd. (1f 35.) In January 2007, UBS solicited IKB to get Loreley to invest in AMP (If 218.) Unlike the other CDOs at issue, AMP was *329 structured as a stand-alone CDS transaction between UBS and Loreley, whereby Loreley were the protection sellers and UBS was the protection buyer. (HH 218-222.) On May 24, 2007, at the closing of the AMP transaction, L28, L29, and L30 made a $100 million investment in AMR (HIT 220-221.) UBS represented that AMP was a safe investment that would only include securities bearing the highest credit rating (AAA). (IT 223.)
Loreley allege that UBS knew that the AAA securities in AMP’s portfolio were actually much riskier than their rating indicated and that Moody’s was in the process of downgrading such securities. (HIT 225-227.) Between November 2007 and March 2008, the AMP securities were downgraded multiple times. (HH 232-234.) By June 2008, Loreley’s investment in AMP was rendered worthless. (H 234.)
4. Cairn
Cairn was a CDO that was co-issued by Cairn Ltd and Cairn LLC, which contained both RMBS and CDSs. (HH 36-37.) In April 2007, UBS solicited IKB to get Loreley to invest in the senior tranches of Cairn, which were rated AAA by Moody’s. (HH 237-239.) On May 30, 2007, L32 made a $71 million investment in Cairn. (H 240.)
Between July 2007 and March 2008, Cairn was downgraded multiple times by Moody’s. (HH 248-250.) Loreley allege that UBS had proprietary knowledge about the aforementioned change in the way Moody’s rated RMBS that led to the downgrades and that UBS also had proprietary knowledge about the impending collapse of the RMBS market. (H 242.) By May 2008, L32’s investment in Cairn was rendered worthless. (H 251.)
Loreley commenced this action on May 23, 2012, asserting six causes of action: (1) fraud against UBS and Declaration; (2) rescission of the four CDO contracts based upon UBS’s fraud; (3) conspiracy to defraud against UBS and Declaration; (4) aiding and abetting fraud against UBS and Declaration; (5) fraudulent conveyance under the New York Debtor and Creditor Law against all defendants; and (6) unjust enrichment against all defendants.
II. Discussion
On a motion to dismiss, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. (Amaro v Gani Realty Corp., 60 AD3d 491 [2009]; Skillgames, LLC v Brody, 1 *330 AD3d 247, 250 [1st Dept 2003], citing McGill v Parker, 179 AD2d 98, 105 [1992]; see also Cron v Hargro Fabrics, 91 NY2d 362, 366 [1998].) The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged, the complaint states the elements of a legally cognizable cause of action. (Skillgames, 1 AD3d at 250, citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977].) Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. (Amaro, 60 AD3d at 491.) “However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration.” (Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune-N.Y. News Syndicate, 204 AD2d 233 [1st Dept 1994].) Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if “the documentary evidence utterly refutes plaintiffs factual allegations, conclusively establishing a defense as a matter of law.” (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002] [citation omitted]; Leon v Martinez, 84 NY2d 83, 88 [1994].)
A. Fraud
To properly plead a cause of action for fraud, the complaint must contain allegations of a representation of material fact, falsity, scienter, reliance, and injury. (Small v Lorillard Tobacco Co., 94 NY2d 43, 57 [1999].) Moreover, pursuant to CPLR 3016 (b), the circumstances constituting the fraud must be stated in detail.
1. Draco
On this motion to dismiss, the court assumes that Declaration breached its contractual obligations by (1) failing to act as an independent collateral manager, allowing Magnetar to select Draco’s investments; (2) entering into CDS contracts that referenced the ABX;[2] and (3) failing to acquire collateral on an arm’s length basis for fair market value. However, Loreley have *331 not asserted a claim for breach of contract; rather, they sue for fraud. As these alleged wrongs arise from Declaration’s contractual duties, they cannot support a fraud claim unless “the alleged misrepresentation[s] [are facts] extraneous to the contract and involve a duty separate from or in addition to that imposed by the contract.” (Hawthorne Group v RRE Ventures, 7 AD3d 320, 323 [1st Dept 2004], citing Deerfield Communications Corp. v Chesebrough-Ponds, Inc., 68 NY2d 954 [1986].) Nonetheless, “a cause of action sounding in fraud is not duplicative of a cause of action to recover damages for breach of contract where the plaintiff sues individuals who were not parties to the contract, and seeks compensatory damages which are not recoverable for breach of contract.” (Introna v Huntington Learning Ctrs., Inc., 78 AD3d 896, 898-899 [2d Dept 2010].) Here, the relevant inquiry is whether Declaration, at the time the Draco offering materials were issued to Loreley, never intended to abide by the representations contained therein. (See Stuart Lipsky, P.C. v Price, 215 AD2d 102, 103 [1st Dept 1995].)
The complaint contains ample, thoroughly fleshed out detail that supports Loreley’s allegation that Declaration never intended to honor or abide by the representations in the Draco offering materials due to the alleged scheme with UBS and Magnetar involving the Constellation CDOs. The detail in the complaint is specific enough to withstand the heightened pleading standard of CPLR 3016 (b). The complaint is so well laid out that this court has been presented with a crystal clear narrative of the purported scheme. Yet, for these very reasons, it is clear that the allegations in the complaint do not state a claim for fraud as to defendants’ conduct related to Draco.
Fundamentally, defendants’ alleged wrongdoing was hiding the nature of Magnetar’s involvement with Draco and their intent to help Magnetar take a short position on Draco’s portfolio. If true, these alleged concealments were not proper, and there are a litany of ways in which defendants may ultimately, if they have not already, suffer adverse consequences for their actions, including other forms of civil liability (e.g., claims for breach of contract or violations of federal securities law), regulatory liability to governmental entities (e.g., to the Securities and Exchange Commission or Financial Industry Regulatory Authority), and possibly criminal liability. However, this court limits its analysis of the allegations to the claim before it, namely, common-law fraud under New York law.
Loreley’s $331 million investment in the subject CDOs represented a massive bet on the health of the housing market. When *332 the housing market crashed, this bet cost them dearly. Loreley, like so many investors, seek to hold the arrangers of CDOs and CDS counterparties liable for their losses. Yet, unlike other cases in which the plaintiff alleged a nexus between the defendant and the failure of RMBS, here, there are no allegations that the securities at issue were compromised by defendants. (See e.g. Dexia SA/NV v Bear, Stearns & Co., Inc., 929 F Supp 2d 231, 243-244 [SD NY 2013] [on motion to dismiss, plaintiffs adequately pleaded loss causation because of defendants’ alleged involvement in underwriting the securitized mortgages].)[3] In this complaint, it is not clear how Magnetar — even if it wanted to — caused the securities at issue to fail.
As discussed supra (part I), an investor in RMBS loses money when homeowners default on their mortgages. Loreley do not (and cannot credibly) allege that any of the financial institutions at issue had the power to cause homeowners to default so that they could reap profits from shorting RMBS. Furthermore, even if Magnetar was capable of hand-picking securities that it knew would fail, to establish that defendants committed fraud by allowing that to happen, Loreley need to allege facts establishing that defendants knew the securities selected by Magnetar were going to fail. The complaint does not allege facts explaining how Magnetar possessed this purported clairvoyance.
Further, under the heightened pleading standard of CPLR 3016 (b), it is insufficient to allege that someone “caused a security to fail.” To state a claim for fraud with the requisite particularity, the plaintiff must allege how the defendant caused the security to fail. A plaintiffs conclusory allegation that a defendant “caused” or “designed” a CDO to fail is inadequate. The court need not conceptually rule out the possibility that Magnetar might have found a way to make sure that credit events occurred for the subject CDSs. However, Loreley’s failure to plead facts[4] as to how the Constellation CDOs were designed to fail creates the strong inference that such inflammatory language is merely a fancy way of saying that Magnetar had a shrewd insight that the subprime housing market was built on nothing more than a house of cards and shorted it accordingly.
*333 It should be noted that there is one way in which defendants might have caused Loreley to lose money on CDS contracts: if a credit event could be triggered by a ratings agency downgrade and defendants conspired with the ratings agencies to cause such a thing to occur. Loreley do not allege that defendants engaged in such a conspiracy. Instead, UBS is alleged to have had some knowledge about the future intentions of the ratings agencies. Specifically, Loreley allege that defendants had “peculiar knowledge” about the upcoming downgrades through a series of proprietary communications with Moody’s. But, these communications all took place after the subject CDOs had closed and Loreley had made their investments. Additionally, Moody’s had issued a public press release about the possibility of a change in its methodology. As sophisticated investment advisors, IKB was or should have been privy to this knowledge. It could have chosen to forgo investing Loreley’s money in the subject CDOs until it conducted further due diligence. It did not. Thus, Loreley are barred from claiming reasonable reliance. (See UST Private Equity Invs. Fund v Salomon Smith Barney, 288 AD2d 87, 88 [1st Dept 2001] [“a sophisticated plaintiff cannot establish that it entered into an arm’s length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it”].)
In reality, the defendants’ scienter is no mystery. By the end of 2006 and the beginning of 2007, the market for long bets on the housing industry was rapidly deteriorating. Many sophisticated financial institutions saw an opportunity to profit from what they believed to be an impending crash in the housing market. They sought to evade losses by purging their balance sheets of their long positions and simultaneously sought to profit by shorting the market. (See e.g. Dodona I, LLC v Goldman, Sachs & Co., 847 F Supp 2d 624, 632-633 [SD NY 2012] [discussing how Goldman allegedly did so].) However, one cannot magically dispose of one’s securities. There must be a willing buyer whose opinion as to the value of the securities differs from the seller’s. Therefore, the sellers of RMBS needed to find investors that disagreed with their assessment of the housing market and were still interested in taking long positions on RMBS, such as Loreley, which still sought to bet long on the housing market as late as May 30, 2007.
With respect to Draco, each party played its part. UBS made Draco happen by bringing together long investors (such as *334 Loreley), short investors (such as Magnetar), and a collateral manager (such as Declaration). The fact that Draco sold protection through CDSs was foreseeable. The identity of the protection buyer is irrelevant because, whoever it was, its bets were foreseeably based on its negative view of the housing market. It is not clear why, had Loreley known that Magnetar was shorting Draco, they would have invested differently. Loreley believed in the housing market and Magnetar did not. They invested accordingly.
Moreover, though the Draco offering materials represent that Draco’s collateral manager would be independent, Loreley were clearly willing to make large bets on the housing market without insisting on an independent collateral manager. For instance, Loreley invested $100 million ($40 million more than it invested in Draco) in AMP without insisting on an independent collateral manager, and they did so at a time (May 2007) when the number of investors willing to take long positions was rapidly shrinking. This belies the notion that the independence of Declaration was essential to Loreley’s decision to invest in Draco.
The instant case differs from the ABACUS cases. (See ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 35 Misc 3d 1217[A], 2012 NY Slip Op 50723[U] [Sup Ct, NY County 2012]; Securities & Exch. Commn. v Goldman Sachs & Co., 790 F Supp 2d 147 [SD NY 2011] [Goldman].) Unlike this case where defendants did not make any affirmative representations about Magnetar, in ACA, the defendant made numerous misrepresentations regarding Paulson’s long positions on ABACUS. (See id. at *2-6.) The facts in ACA make it clear that ACA would not have provided financial guarantee insurance for ABACUS had it known that Paulson was betting short because ACA specifically did not want to bet against Paulson. (See id.) Here, in contrast, there is nothing in the complaint that indicates that Loreley particularly cared about Magnetar’s investment strategy. Importantly, Loreley, as sophisticated investors, knew that there had to be deep pocketed counterparties to their long positions. If there were no investors in the market willing to bet against Loreley’s investment, the subject CDS contracts would never have been executed.
The circumstances of ABACUS were fleshed out in detail in Goldman, where it was clear that the affirmative misrepresentations about Paulson’s long positions were essential to ACA’s decision to insure ABACUS. (See id. at 162-163.) Here, in contrast, based on Loreley’s overall investment strategy, this *335 court cannot draw a reasonable inference from the complaint that the disclosure of Magnetar’s role would have saved Loreley from betting on RMBS related CDOs.
Finally, this court must address the issue of loss causation in light of the Appellate Division’s holding in MBIA Ins. Corp. v Countrywide Home Loans, Inc. (87 AD3d 287, 294-296 [1st Dept 2011]). As Justice Bransten explained, “[the Appellate Division] did not hold that [plaintiffs loss] must be shown to have been directly caused by [defendant’s] alleged misrepresentations.” (Syncora Guar. Inc. v Countrywide Home Loans, Inc., 36 Misc 3d 328, 339 [Sup Ct, NY County 2012].) Rather, “[the plaintiff] must prove that [defendant] made misrepresentations that were material to its decisions to [enter into the subject transaction].” (Id. at 341.) In construing this rule along with the pleading standard set forth by the Court of Appeals, to survive a motion to dismiss, the plaintiff must allege facts giving rise to a “reasonable inference” that the subject representation was material to its decision to enter into the transaction. (See Pludeman v Northern Leasing Sys., Inc., 10 NY3d 486, 492 [2008].)
In light of Loreley’s explicit investment strategy set forth in the complaint — making hundreds of millions of dollars of long bets on the housing market — Loreley’s claims related to Draco are ripe for dismissal. The only reasonable inference that this court can draw from the complaint is that Loreley intended to invest in the securities purchased by Draco that turned out to be worthless. Unlike the ABACUS cases, Loreley plead no facts to suggest that the identity of Draco’s CDS counterparty was particularly important (to the extent that it was, contract remedies are the proper manner of redress). Defendants made no representations extraneous to the contracts concerning Magnetar. If Loreley were given explicit assurances that, like Paulson, Magnetar was betting long on Draco, this case would be nothing more than another ABACUS deal. However, this case is not ABACUS. (See Woori Bank v RBS Sec., Inc., 910 F Supp 2d 697, 700 [SD NY 2012] [“the deals in this case are, like most deals of that time, somewhat suspect. But not all such deals are inherently fraudulent or misleading simply because they involved subprime mortgages and the sale of what are now worthless investments that were once pitched as safe”].)
In sum, with respect to Draco, the fraud claim is dismissed because Loreley have not pleaded facts explaining how Magnetar’s involvement with Draco caused Loreley’s losses and the *336 court cannot draw a reasonable inference from the complaint that the subject representations were material to Loreley’s decision to invest in Draco. Instead, “the Court finds that [Loreley failed to sufficiently allege] that defendants’ misrepresentations hid facts that caused the ultimate economic harm [Loreley] suffered.” (See Dexia, 929 F Supp 2d at 243.)
2. TABS
On this motion to dismiss, the court assumes that Tricadia breached its contractual obligations by: (1) failing to act as an independent collateral manager by allowing UBS to select TABS’s investments; and (2) failing to acquire collateral on an arm’s length basis for fair market value. Also, the court assumes that UBS represented to Loreley that TABS’s investments could “withstand extreme conditions and adhere to a zero principal-loss standard.”
As with Draco, the facts in the complaint set forth a cause of action for breach of contract against Tricadia and possibly a claim for tortious interference against UBS, not fraud. With respect to TABS, Loreley have not identified the breach of a duty that arises independently of the contracts that govern the parties’ obligations.
As for the “extreme conditions” representation, Loreley, counseled by sophisticated and experienced financial advisors, could not reasonably rely on it. By definition, one receives investment returns in exchange for exposing principal to risk. In the case of CDSs, if there were no risk of principal loss, there would be no market for purchasing protection. Hence, the fraud claim related to TABS is dismissed since the complaint contains no representation that can form the basis for fraud.
3. AMP and Cairn
Similarly, the claims related to AMP do not support a fraud claim. UBS was the disclosed counterparty to the CDS contracts. There are no allegations that the subject securities did not have the required ratings, nor it is alleged that any of the selected collateral did not conform to the contractual requirements. Likewise, with respect to Cairn, Loreley have not identified any fraudulent representations. Furthermore, as discussed supra (part II.A. 1) Loreley have not identified any information about impending changes to the ratings agencies’ methodology that was not publicly disclosed before Loreley invested in AMP and Cairn. Ergo, Loreley have failed to state a fraud claim with respect to AMP and Cairn.
*337 B. Rescission, Conspiracy to Defraud, and Aiding and Abetting Fraud
These causes of action are dismissed because, as discussed supra (part II.A), Loreley have failed to state a claim for fraud. (See Cherokee Owners Corp. v DNA Contr., LLC, 96 AD3d 480 [1st Dept 2012]; Agostini v Sobol, 304 AD2d 395 [1st Dept 2003].)
C. Fraudulent Conveyance
Loreley assert claims against UBS and Declaration for constructive fraudulent conveyances under Debtor and Creditor Law §§ 273 and 274 and actual fraudulent conveyances under Debtor and Creditor Law § 276. To state a claim under sections 273 and 274, the plaintiff must establish that the defendant (1) made a conveyance; (2) without fair consideration; (3) by a person who is insolvent or who becomes insolvent as a consequence of the transfer. (Zanani v Meisels, 78 AD3d 823, 824 [2d Dept 2010].) Loreley cannot maintain a claim for constructive fraudulent conveyance because they merely allege that the subject securities were not sold at “market prices.” This allegation is insufficient. The value received must be “ ‘disproportionately small’ as compared to the value of the transferred property.” (Lippe v Bairnco Corp., 249 F Supp 2d 357, 377 [SD NY 2003].) Here, the allegation that defendants overpaid for certain securities is insufficient to support this claim. Moreover, Loreley cannot maintain a claim under Debtor and Creditor Law § 276 because, as discussed supra (part II.A), Loreley failed to state a claim for fraud. (See Zanani, 78 AD3d at 825.)
D. Unjust Enrichment
Nor can Loreley maintain a claim for unjust enrichment. The legality of the subject transactions and the defendants’ entitlement to fees are governed by written contracts. (Goldman v Metropolitan Life Ins. Co., 5 NY3d 561 [2005].) Accordingly, it is ordered that the motions to dismiss by defendants UBS Limited, UBS Securities LLC, UBS AG, and Declaration Management & Research LLC are granted against plaintiffs Loreley Financing (Jersey) No. 4 Limited, Loreley Financing (Jersey) No. 6 Limited, Loreley Financing (Jersey) No. 28 Limited, Loreley Financing (Jersey) No. 29 Limited, Loreley Financing (Jersey) No. 30 Limited, and Loreley Financing (Jersey) No. 32 Limited, and the Clerk is directed to dismiss the complaint against said defendants with prejudice.

. For reasons unknown to this court, Loreley have not sued Magnetar for the allegations set forth in the complaint.

. The documentary evidence appears to refute this alleged breach because the CDS contracts reference 18 of the 20 securities that comprised the ABX, not the entire ABX, which is what is prohibited by the Draco offering materials. Should this have been prohibited by contract, the sophisticated contracting parties would have so provided. In any event, this is immaterial for the reasons explained herein, because Loreley cannot maintain their fraud claim related to Draco.

. Loreley’s general allegations about UBS’s role in the mortgage underwriting business are not on par with allegations, such as in Dexia, where there is a direct link between the subject RMBS and the mortgages that comprised them. Here, no specific connection is made between the underwriting and the four CDOs at issue.

. The conclusory allegations in paragraph 7 are not nearly enough.