OPINION OF THE COURT
Shirley Werner Kornreich, J.
Plaintiffs move for reargument and renewal of the court’s order dated April 5, 2013 (the April order), which dismissed the complaint with prejudice. Plaintiffs’ motion is denied for the reasons that follow.
The court assumes familiarity with the April order, which sets forth the facts in detail.[1] In short, plaintiffs are special purpose investment vehicles managed by IKB, a German bank well known for having invested its clients’ money in long residential mortgage backed securities (RMBS) positions shortly before the market crashed in 2007 (e.g., IKB also invested its clients’ money in ABACUS, the collateralized debt obligation [CDO] at issue in ACA Fin. Guar. Corp. v Goldman, Sachs & Co. [35 Misc 3d 1217(A), 2012 NY Slip Op 50723(U) (Sup Ct, NY County 2012)], discussed below). In this action, plaintiffs allege that two of the CDOs at issue were Magnetar deals — that is, their collateral was supposedly “designed to fail” by Magnetar.[2] Allegedly, Magnetar selected the collateral instead of defendant Declaration Management & Research LLC and nonparty Tricadia CDO Management, LLC, the official collateral managers for Draco 2007-1 and TABS 2007-7 respectively. As for the other two CDOs, plaintiffs alleged they were fraudulently induced to invest in them based on various false statements made by UBS. The court will not repeat the reasons for dismissal set forth in the April order. Rather, the court will only discuss (1) subsequent cases which bolster the original bases for dismissal; (2) loss causation, addressed here in more detail than in the April order; and (3) why emails about a ratings agency *860 methodology change does not save the AMP CDO 2007-2 and Cairn Mezz ABS CDO IV fraud claims.
I. Legal Standard
Pursuant to CPLR 2221 (d) (2),
“[a] motion for leave to reargue . . .
“2. shall be based upon matters of fact or law allegedly overlooked or misapprehended by the court in determining the prior motion, but shall not include any matters of fact not offered on the prior motion.” (Mendez v Queens Plumbing Supply, Inc., 39 AD3d 260 [1st Dept 2007].) Pursuant to CPLR 2221 (e), “[a] motion for leave to renew ‘shall be based upon new facts not offered on the prior motion that would change the prior determination,’ and ‘shall contain reasonable justification for the failure to present such facts on the prior motion.’ ” (Queens Unit Venture, LLC v Tyson Ct. Owners Corp., Ill AD3d 552, 552 [1st Dept 2013].) A renewal motion is not “a second chance freely given to parties who have not exercised due diligence in making their first factual presentation.” (Id., quoting Sobin v Tylutki, 59 AD3d 701, 702 [2d Dept 2009].) “The motion . . . [should be] denied ... [if the movant] fail[s] to proffer a reasonable excuse for not presenting the allegedly new facts on the initial motions.” (Illinois Natl. Ins. Co. v Zurich Am. Ins. Co., 107 AD3d 608, 609-610 [1st Dept 2013].)
II. Recent Cases
In the April order, the court felt it important to distinguish this case from the ABACUS cases. ABACUS was a transaction where Goldman Sachs partnered with a monoline insurer, ACA, to sell long RMBS positions through a CDO. The prospective investors were told that ACA, like Declaration, would be an independent collateral manager, whose interests would be aligned with the long investors. However, Goldman and ACA secretly agreed that they would allow another hedge fund, called Paul-son, to actually pick the collateral. ACA agreed to the plan because Goldman told it that Paulson would also be betting long — hence aligning its interest with both ACA and the other investors. In truth, Goldman knew that Paulson was betting short, and did not tell this to ACA. Ultimately, the housing market crashed, Paulson made a killing shorting the market, and ACA and the long investors lost money.[3] Lawsuits were filed.
*861 This court addressed a decision by another Commercial Division Justice, who denied Goldman’s motion to dismiss ACA’s fraud claim relating to ABACUS, and distinguished it. (See ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 35 Misc 3d 1217[A], 2012 NY Slip Op 50723[U] [Sup Ct, NY County 2012].) Simply put, ACA, at first glance, appeared more egregious than this case.[4] In any event, approximately one month after the April order was issued, the Appellate Division reversed the ACA decision, dismissing the case. (ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 106 AD3d 494 [2013].) Thus, it would appear, if ACA is not a viable fraud case, this case is not viable.
Yet, given that there are differences between ACA and this case, the court is guided by another recent, well reasoned and persuasive federal case, which is exactly on point. (See Financial Guar. Ins. Co. v Putnam Advisory Co., 2013 WL 5230818, 2013 US Dist LEXIS 129120 [SD NY, Sept. 10, 2013, Sweet, J., No. 12-Civ-7372 (RWS)].) That case also involved allegations that Magnetar secretly selected a CDO’s collateral. (2013 WL 5230818, *2-3, 2013 US Dist LEXIS 129120, *3-6.) Judge Sweet dismissed that case because “[plaintiff] failed [to] put forth allegations supporting the contention that any part of [plaintiffs] losses were caused by the alleged misrepresentation, rather than external market forces.” (2013 WL 5230818, *3, 2013 US Dist LEXIS 129120, *9.) That is, plaintiff could not plead loss causation.[5] Judge Sweet explained:
“[Plaintiff] has contended that it has pled loss causation via its allegation ‘that the very wrong of which it complains — that the . . . collateral was *862 selected by a net short investor with interests adverse to long investors — caused the collateral to be far more likely to default than that of a typical CDO, even in the event of market-wide losses.’ However, this allegation is not adequately supported, as [plaintiff] has not buttressed it with facts sufficient to demonstrate that there was any pool of collateral that could have avoided default while still conforming to [the CDO’s] detailed eligibility criteria.
“Since [plaintiff] has not alleged facts sufficient to show that . . . [its losses were caused by] Magnetar [controlling] the . . . collateral selection process— rather than a consequence of the general market downturn that coincided with the default of many other CDOs during the same time period in which [the subject CDO] failed, see, e.g., Nat’l Comm’n on the Causes of the Fin. & Econ. Crisis, The Financial Crisis Inquiry Report: Final Report 148 (2011) (stating that 91% of U.S. CDO securities had been downgraded by the end of 2008), it has failed to plead the loss causation element of its fraud claim.” (2013 WL 5230818, *3, 2013 US Dist LEXIS 129120, *6-8 [citations omitted; emphasis added], citing Len-tell v Merrill Lynch & Co., Inc., 396 F3d 161, 174 [2d Cir 2005] [“(W)hen the plaintiffs loss coincides with a marketwide phenomenon causing comparable losses to other investors ... a plaintiffs claim fails when it has not adequately ple( )d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events” (internal quotation marks omitted)].)
In other words, based on the offering materials’ disclosed collateral criteria (i.e., the type of RMBS which plaintiffs wished to invest in), it did not matter if Magnetar picked the collateral because, no matter who chose the RMBS, plaintiffs were going to lose their money. This is unquestionably so because, as Judge Sweet correctly observed, virtually all of the eligible RMBS (rated BBB-) failed.[6] Consequently, though Magnetar may have thought it was getting a better spread, the spread took a back *863 seat to a massive economic event — the financial crisis. No hedge fund, absent some wizardly abilities, could have caused a different result.
III. Loss Causation
Judge Sweet’s opinion is especially notable given the recent trend of attorneys conflating transaction (“but for”) causation and loss causation. Under New York law, a common-law fraud claim must be dismissed if loss causation is not pleaded with particularity. (See Greentech Research LLC v Wissman, 104 AD3d 540, 540 [1st Dept 2013] [“The court properly dismissed the fraud claim for failure to plead fraud with the particularity required by CPLR 3016 (b) and for failure to plead loss causation” (emphasis added)], citing Laub v Faessel, 297 AD2d 28, 31 [1st Dept 2002].) In Laub, the First Department explicitly set forth the following standard in a fraud case: “To establish causation, plaintiff must show both that defendant’s misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation).” (297 AD2d at 31 [emphasis added]; see also Dexia SA/NV v Bear, Stearns & Co., 929 F Supp 2d 231, 243 [SD NY 2013, Rakoff, J.] [plaintiff “must plead facts that indicate that the information concealed by the defendants’ misrepresentations was ‘the reason the transaction turned out to be a losing one’ ”], quoting First Nationwide Bank v Gelt Funding Corp., 27 F3d 763, 769 [2d Cir 1994].) As the Second Circuit explained:
“In the context of predicate acts grounded in fraud, the proximate cause requirement means that the plaintiff must prove both transaction and loss causation. Thus, in addition to showing that but for the defendant’s misrepresentations the transaction would not have come about, the defendant must also show that the misstatements were the reason the transaction turned out to be a losing one . . .
“The purpose of the proximate cause requirement is to fix a legal limit on a person’s responsibility, even for wrongful acts. Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, *864 but only to those with respect to whom his acts were ‘a substantial factor in the sequence of responsible causation,’ and whose injury was ‘reasonably foreseeable or anticipated as a natural consequence.’ ” (First Nationwide, 27 F3d at 769 [citations omitted].)
Ergo, transaction causation and loss causation are separate elements, and each must be adequately pleaded with particularity to survive a motion to dismiss. Therefore, though an investor may be able to prove that he would not have invested but for the misrepresentation, if the investor lost his money for wholly unrelated reasons (say, the market crashing), the investor cannot get his money back via rescission. This makes perfect sense and is the law in this state. If this were not the law, for instance, one could sue for a stock’s depreciation on the grounds that the company represented an earnings expectation that proved to have no basis in fact when the stock’s depreciation occurred during a massive economic downturn, when all stocks in a particular asset class declined, regardless of their individual forecasted earnings. There is a litany of precedent firmly establishing that the loss causation element exists precisely to prevent opportunistic investors from getting their money back when their losses had nothing to do with the subject representations. (See Dexia, 929 F Supp 2d at 243 [“when a ‘plaintiffs loss coincides with a marketwide phenomenon causing comparable losses to other investors,’ a plaintiff must allege specific facts ‘which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events’ ”], quoting Lentell, 396 F3d at 174 [“our precedents make clear that loss causation has to do with the relationship between the plaintiffs investment loss and the information misstated or concealed by the defendant”].)[7] Indeed, if loss causation was not a required element, every market downtown would subject every investment to a fraud claim.
*865 That is what this case is about. IKB and the Loreley funds bet wrong on the housing market, and it cost them dearly. Yet, they astutely observed that many on Wall Street had an unfortunate habit of playing fast and loose with various aspects of structured finance deals, ranging from the very underpinnings of an investment (e.g., RMBS based on fraudulent loans) to greyer areas (e.g., the process of procuring a rating for a synthetic CDO). (See Woori Bank v RBS Sec., Inc., 910 F Supp 2d 697, 700 [SD NY 2012] [“the deals in this case are, like most deals of that time, somewhat suspect. But not all such deals are inherently fraudulent or misleading simply because they involved subprime mortgages and the sale of what are now worthless investments that were once pitched as safe”].) Misconduct may have occurred, but if the misconduct was not the basis for the loss, a viable claim is not pleaded. For these reasons, and the reasons discussed in the April order,[8] dismissal with prejudice is warranted on the fraud claims relating to Draco and TABS, because no amendment can overcome the truth about loss causation.
IV The Moody’s Emails
In the April order, the court failed to fully explain why certain UBS emails do not help plaintiffs’ case with respect to AMP and Cairn. Plaintiffs invested in AMP and Cairn on May 24 and May 30, 2007, respectively. The emails suggest that UBS may have had knowledge of Moody’s’ (the relevant ratings agency) potential to change its methodology, something which might impact the future value of the securities. The May 17, 2007 email relates to a Moody’s press release from that same day, which suggested that a methodology change may be coming. As the court noted in the April order, this press release put IKB, a sophisticated investment advisor, on notice of downgrades. If IKB had a concern that methodology changes might impact RMBS investments, it could have and should have done the *866 requisite due diligence before investing in AMP and Cairn later that month. (See UST Private Equity Invs. Fund v Salomon Smith Barney, 288 AD2d 87, 88 [1st Dept 2001] [“a sophisticated plaintiff cannot establish that it entered into an arm’s length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it”].)
But, on this motion, plaintiffs claim that a UBS email sent after plaintiffs invested, on July 5, 2007, indicates that UBS met with Moody’s and had actual knowledge of the upcoming downgrades before plaintiffs invested. This, too, does not matter. Mere speculation about a meeting (as the email only alludes to a meeting, without providing any detail about when it happened or what was said) is insufficient under CPLR 3016 (b). Moreover, that UBS would have had meetings with Moody’s is wholly unremarkable. The email does not indicate that UBS was given any proprietary knowledge that IKB lacked. To wit, IKB, which, in 2007, was one of the biggest players in the RMBS market, cannot credibly contend that it was not in a position to conduct robust due diligence on the ratings agencies when billions of its clients’ dollars were on the line. Indeed, IKB’s marketing materials tout its relationships with the ratings agencies. This is not to say that a global banking giant, like UBS, stands on equal footing with IKB. However, this is always the case when dealing with a global bank. Inferior knowledge is an inherent disadvantage in such a situation, but, absent a fiduciary duty, which is lacking in the subject arm’s length securities transactions, banks absolutely do not have to disclose all they know about a market, so long as they do not lie about such knowledge in their offering materials. This is why the offering materials for the subject CDOs specifically provide that each side will conduct their own due diligence.
Finally, it is essential to remember that UBS was the disclosed counterparty to AMP That is, UBS was shorting the very thing plaintiffs were buying, and plaintiffs knew it. UBS had a different view of the market than IKB. That is how markets work. Various investors gather the information they can get their hands on, form opinions, and invest accordingly. When there are no lies and all of the relevant information is discoverable, there is no fraud. Again, this is not to say that there was not massive fraud at the heart of the financial crisis. There surely was. But, an investor cannot invoke three dirty words — mortgage backed securities — and automatically think it will win. Some investors, *867 like IKB, genuinely had a different view of the market, for whatever reason. They were wrong. But they were not defrauded in this case.
Accordingly, it is ordered that upon reargument and renewal of defendants’ motions to dismiss, the court adheres to its original decision, dismissing the complaint with prejudice, for the reasons set forth in this decision and in the court’s original decision dated April 5, 2013.

. All defined terms have the same meaning as in the April order, which can be found at docket 105 and 40 Misc 3d 323 (2013).

. Much has been made of Magnetar purchasing a CDO’s equity tranche (the riskiest long position), while taking the short side of that same CDO’s credit default swaps multiple times over. There is nothing legally wrong with this (the moral hazard issue, on the other hand, is something for regulators to deal with). This can be done as a hedge or as part of an arbitrage strategy. More realistically, Magnetar likely wanted to use the revenue from being long on the equity to fund its short bet on the senior tranches. This strategy ensured that Magnetar’s investors would not see their portfolio decline while the short bet was being funded.

. This is an oversimplification, since the actual structure of the transaction was more complicated, involving other intermediary parties, such as ABN AMRO. The ABACUS deal raises many issues, such as counterparty credit risk, but such issues are too far afield to discuss in this decision.

. Interestingly, ACA may have involved the in pari delicto doctrine, which prohibits coconspirators in a fraudulent scheme from suing each other. (See Kirschner v KPMG LLP, 15 NY3d 446, 464 [2010].) ACA and Goldman conspired to lie to investors about ACA’s independence, but Goldman conspired with Paulson to lie to ACA. ACA wanted to be compensated for the latter scheme, despite such scheme taking place in the context of ACA’s own conspiracy with Goldman. To wit, the real loser on the deal was ABN AMRO, whose losses far exceeded ACA’s.

. As in this case, Judge Sweet rejected plaintiffs’ contention that “under New York law it is not required to plead loss causation because it is seeking only rescissory damages.” (2013 WL 5230818, *4, 2013 US Dist LEXIS 129120, *10.) Judge Sweet noted “that proposition has previously been rejected by this Court.” (Id., citing Emergent Capital Inv. Mgt., LLC v Stonepath Group, Inc., 165 F Supp 2d 615, 627 n 2 [SD NY 2001] [holding that “(t)he absence of adequate causation is . . . fatal to a common law fraud claim under New York law,” and therefore rejecting plaintiffs contention that “it should be able to proceed with its common law fraud claim because New York law does not require proof of loss causation where only rescission is sought”].)

. Plaintiffs’ supposed expert evidence that Magnetar CDOs had slightly greater than average losses misses the point. Aside from issues such as lack of statistical significance and other methodological flaws (such as the fact that the relevant comparison is not Magnetar CDOs to general CDOs, but to CDOs *863 with similar collateral criteria), marginal loss differences, essentially a micro-economic argument, does not affect the macroeconomic reality that loss causation, in this case, was a market-based event. As Declaration’s counsel aptly put it: “there is no pool of collateral. . . consistent with [90% BBB-] or below that wouldn’t have also collapsed.” (Tr at 34.)

. The federal courts continue to maintain that the New York common-law fraud standard for claims arising from the sale of securities, including RMBS, includes the element of loss causation. (See Bank of Am,., N.A. v Bear Stearns Asset Mgt., — F Supp 2d —, —, 2013 WL 4734495, *5, 2013 US Dist LEXIS 125700, *14-15 [SD NY, Sept. 3, 2013, No. 08-Civ-9265 (AJN)].) It is important to note that “warranty fraud” cases, where a fraud claim is allowed to proceed with a breach of contract claim, is not the same as a garden variety securities fraud claim. Fraud based on breach of a warranty, as in monoline cases (e.g. MBIA Ins. Corp. v Countrywide Home Loans, Inc., 39 Misc 3d 1220[A], 2013 NY Slip Op 50677[U] [Sup Ct, NY County 2013]), have separate legal considerations, such as insurance law, and are guided by unique principles *865 that do not affect the normal loss causation standard. (See generally Merrill Lynch & Co. Inc. v Allegheny Energy, Inc., 500 F3d 171, 183-184 [2d Cir 2007]; DDJ Mgt., LLC v Rhone Group L.L.C., 15 NY3d 147 [2010].) As this court has explained, it has long been the law that “the analysis of reliance in a tort action based on fraud or misrepresentation (tort reliance) differs from the analysis of reliance in actions for breach of express contractual warranties (warranty reliance).” (Project Gamma Acquisition Corp. v PPG Indus., Inc., 34 Misc 3d 771, 778 [Sup Ct, NY County 2011]; accord CBS Inc. v Ziff-Davis Publ. Co., 75 NY2d 496 [1990].)

. To be sure, for the reasons explained in the April order, plaintiffs also cannot plausibly assert reasonable reliance, a separate and independent ground for dismissal.